UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                          :

    v.                                  :  Crim. No. 21-537 (JMC)

JASON BLYTHE                           :

## DEFENDANT'S MOTION TO DISMISS COUNTS FIVE, SIX, AND TEN

Defendant, Jason Blythe, through undersigned counsel, Stephen F. Brennwald, Esq., Brennwald & Robertson, LLP, hereby moves to dismiss counts five, six, and ten of the indictment pursuant to Fed. R. Crim. P. 12(b). In support of the foregoing, defendant states as follows:

### Factual Background

On January 24, 2022, Mr. Blythe following his indictment in this case.  The indictment charges him with a variety of charges, but the only charges relevant to this indictment are found in counts six, eight, and ten.   Counts five and six charge Mr. Blythe with a violation of 18 U.S.C. § 1752(a).

The government alleges, *inter alia*, that defendant and his co-defendants committed crimes in relation to the January 6, 2021, certification of the presidential vote proceeding.

### ARGUMENT

### General Principles

An indictment must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). It "must provide the defendant sufficient detail to allow him to prepare a defense, to defend against a subsequent prosecution for the same offense, and to ensure that he be prosecuted upon facts presented to the grand jury."

1

*United States v. Apodaca*, 275 F. Supp. 3d 123, 153 (D.C. Cir. 2017) (citing *Russell v. United States*, 369 U.S. 749 (1962), and *Stirone v. United States*, 361 U.S. 212 (1960)). A criminal defendant "may raise by pretrial motion any defense, objection, or request that the Court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Rule 12 provides that a defendant may also move to dismiss the Indictment for "failure to state an offense" and "lack of specificity." Fed. R. Crim. P. 12(b)(3)(B)(iii), (v).

A criminal statute is unconstitutionally vague if it "fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement." *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)). "The touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259 (1997). The "void-for-vagueness doctrine" protects against arbitrary or discriminatory law enforcement. *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).

The rule of lenity applies if the terms of the statute are ambiguous; once it is determined that a statute is ambiguous, the rule of lenity "requires that the more lenient interpretation prevail." *United States v. R.L.C.*, 503 U.S. 291, 293 (1992). This rule is rooted in "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *Id*. at 305 (quoting *United States v. Bass*, 404 U.S. 348, 336 (1971)). The Courts have "[r]eserved lenity for those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute." *Id*. (citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)). "Whether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words. Rather, 'the plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole. *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Robinson v. Shell Oil Co*., 519 U.S. 337, 341 (1997)).

## I.   Section 1512(c)(2) as Alleged in the Indictment Fails to State an Offense

### a.   Congressional Intent and Statutory Construction of 18 U.S.C. §1512(c)(2)

Section 1512(c)(2)'s purpose is to protect the integrity of hearings before tribunals by preventing witness tampering and destruction of evidence.

18 U.S.C. §1512(c) provides: "Whoever corruptly –

  (1) Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

  (2) Otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so…shall be fine….or imprisoned…

*Id.* § 1512(c). In turn, an "official proceeding" is defined as –

3

    (1) A proceeding before a judge or court of the United States, a United states magistrate judge, bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

    (2) A proceeding before the Congress;

    (3) A proceeding before a Federal Government agency which is authorized by law; or

    (4) A proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce;

*Id.* § 1515(a)(1).

Section 1512(c) was enacted as part of the Sarbanes-Oxley Act of 2002, which is titled "Corporate Fraud Accountability," and which targets "corporate malfeasance." Pub. L. No. 107-204, 116 Stat. 745. Sarbanes-Oxley was designed to "protect investors and restore trust in financial markets following the collapse of the Enron Corporation" after revelations that Enron's outside auditor had "systematically destroyed potentially incriminating documents." *Yates*, 574 U.S. at 532. In *Yates*, the Supreme Court narrowly interpreted the term "tangible object" in §1519 in keeping with the specific context and purpose of Sarbanes-Oxley. *See* 18 U.S.C. §1519 ("Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States … . ").

Recognizing that, in the Sarbanes-Oxley legislation, "Congress trained its attention on corporate and accounting deception and cover-ups." *Id.* at 532. The Supreme Court held that the Act did not contemplate penalizing the act of tossing undersized fish overboard to avoid the

consequences of an inspection by federal authorities. Rather, in the context of the statute's purpose, a "tangible object' must be one used to record or preserve information." *Id*. So while fish are tangible objects in the ordinary sense of that phrase, they do not qualify as tangible objects for purposes of § 1519.

In an amendment to § 1512, the Sarbanes-Oxley Act added the current subsection (c)(2), which penalizes corruptly obstructing, influencing, or impeding "any official proceeding." The term "official proceeding" is defined in § 1515 to include a proceeding "before a judge or court of the United States" and a proceeding "before the Congress." Like the phrase "tangible objects" in §1519, the phrase "official proceeding" in § 1512 requires interpretation.

"Dictionary definitions of the term 'proceeding' alone . . . cannot conclusively resolve" whether a proceeding is an "official proceeding" under §1512. *United States v. Ermoian*, 752 F.3d 1165, 1170 (9th Cir. 2013). Courts have interpreted "official proceeding" to imply something formal. *See United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (holding that FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (holding that ATF investigation is not an "official proceeding" because the term encompasses "events that are best thought of as hearings (or something akin to hearings)"). As with the phrase "tangible object" in § 1519, "official proceeding" must be interpreted in light of the statute's express purpose "to enhance and protect the necessary role of crime victims and witnesses in the criminal justice process." *United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008).

In the context of this "witness tampering" statute, an "official proceeding before the Congress" is logically limited to the same type of "adversarial nature" as court proceedings where there is a potential for witnesses to be influenced or documents destroyed. *See* S. Rep. No. 107-

146, at *6 (2002). Not only must "the charged conduct have some reasonable nexus to a record, document or tangible object," *United States v. Singleton*, 2006 WL 1984467 *3 (S.D. Tex. 2006), or to witness testimony, *United States v. Kumar*, 617 F.3d 612, 619-20 (2d Cir. 2010), but the obstruction must concern a proceeding involving adjudicative or at least "quasi-adjudicative responsibilities." *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009).

In *Ermoian*, for example, the Ninth Circuit held that an "official proceeding" suggests a "formal appearance before a tribunal," so that an FBI field investigation did not qualify. 752 F.3d at 1170-71. "[W]hen examining the term 'proceeding' within the grammatical structure of the definition at issue, it becomes clear that the term connotes some type of formal hearing." *Id*. The court focused on § 1512's reference to "preventing the attendance or testimony of any person," "preventing the production of a record, document, or other object, in an official proceeding," and "being absent from an official proceeding to which that person has been summoned by legal process." *Id*. at 1171-1172. It was important to the court that the statute used the words, "testimony," "attendance," "production," and "summons," all of which "strongly implies a hearing before a formal tribunal." *Id.* at 1172. *Accord Sutherland*, 921 F.3d at 426 (the term "proceeding" implies 'some formal convocation….in which parties are directed to appear") (quoting *United States v. Young*, 916 F.3d 368, 384 (4th Cir. 2019)).[1]

### b.  The Electoral Count on January 6 Was Not an "Official Proceeding"

When considering the legislative history of 18 U.S.C. §1512 and Congress's role in counting electoral votes pursuant to the 12th Amendment and the Electoral Count Act of 1887,

---

[1] The D.C. Circuit has not addressed the question, except in a pre-Sarbane-Oxley version of § 1512, one that did not include the current subsection (c)(2), where the Court held that by entering into a plan to encourage others to falsify documents and to testify falsely before the Inspector General in a matter that was to be passed to the grand jury, the defendant obstructed an official proceeding. *United States v. Kelley*, 36 F.3d 1118, 1123 (D.C. Cir. 1994).

later codified in 3 U.S.C. § 15, the electoral count is a ceremonial and administrative event that does not qualify as an "official proceeding." The Twelfth Amendment and the Electoral Count Act of 1887 place the responsibility on Congress to count electoral votes after the states have already heard any disputes and certified the vote. *Bush v. Gore*, 531 U.S. 98, 154 (2000) (Breyer, J., dissenting). Members of Congress may make an objection, in writing, and without argument. 3 U.S.C. § 15. According to the statute, there is no testimony, no witnesses, no argument, and no evidence. *Id*. Given this, an electoral count is simply not an adjudicative proceeding of the type that falls within the ambit of a witness tampering statute such as § 1512(c)(2).

The sponsors of the Electoral Count Act hoped that "if the disputes touching the Constitution of the Electoral Colleges in the States could be disposed of in advance of their action, the counting of the electoral votes at the seat of government . . . would be usually a little more than a *formal ceremony*." Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 FLLR 541, 585 (2004) (quotation omitted). Section 5 of the Act provides that the State's selection of electors "*shall be conclusive*, and shall govern in the counting of the electoral votes" if the procedural rules have been followed. *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, J., concurrence) (emphasis added). Thus, the legislative history of the Act demonstrates that Congress's Electoral Count is intended to be a "ceremonial" finalization and recording of the votes that have already been certified by the states. So while Congress is in session on January 6, it is not an "official proceeding" for purposes of §§ 1512(c) and 1515(b).

Count Ten of the Indictment, which alleges that Mr. Blythe intended to "impede or influence" Congress's certification of the Electoral College vote, is based on the belief that the "ceremonial" vote count is an "official proceeding" for purposes of §1512(c). However, as outlined by the legislative history and purpose of the Electoral Act of 1887, "obstruction of an official

proceeding before Congress" was never intended to apply to an event, like the vote count, that involves no witness testimony, documentary or tangible evidence, or meaningful adjudication. Many congressional hearings *do* involve witness testimony and documentary evidence, and allow Congress to exercise their investigatory power. In those instances, § 1512(c) protects the integrity of witness testimony and evidence. *See generally United States v. Poindexter*, 951 F.2d 369, 382 (D.C. Cir. 1991) (discussing how the Victim and Witness Protection Act of 1982 created a new provision, §1512, which prohibits various forms of witness tampering). By contrast, Congress's counting of the Electoral College votes is not an adjudicative proceeding; Congress was merely tasked the ceremonial and administrative task of confirming the requirements for certification have been followed *after* the states previously have determined that the votes were lawfully certified.

This administrative and ceremonial proceeding is not the target of § 1512(c) and the government cannot conveniently group the unique tradition of the Electoral Count with every other Congressional hearing as they are completely different and possess different functions and characteristics. The government also cannot ignore years of precedent and legislative history plainly demonstrating that § 1512(c)(2) is limited to adjudicative hearings where there is a potential for destruction of documents and witness tampering.

> **c. Even if the Court Determines that the Electoral Count is an "Official Proceeding," § 1512(C)(2) is Unconstitutionally Vague and is Especially Vague as Applied to this Case**

Under the same principles of *United States v. Johnson,* 576 U.S. 591 (2015), and its progeny, §1512(c)(2) violates due process as it is vague and does not provide fair notice to Mr. Blythe as to the conduct it punishes. The statute provides that:

Whoever *corruptly* –

1. Alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an *official proceeding*; *or*

2. *Otherwise obstructs, influences, or impedes any official proceeding*, or attempts to do so…shall be fine….or imprisoned…

18 U.S.C. §1512(c)(1)(2)(emphasis added). Section 1512(c)(2) uses words throughout both sections that require courts—and anyone reading the statute—to speculate as to their meaning in the context of a defendant's particular actions. Courts must speculate as to the meaning of the word "corruptly" and the words "official proceeding." Even more problematic is that subsection (c)(2) is a "residual clause," one that is ambiguous and requires courts to determine exactly what line must be drawn in determining if a defendant is *otherwise* obstructing, impeding, or influencing an official proceeding before Congress.

In *Johnson,* the Supreme Court explained that "the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." 576 U.S. at 597. There, the Court found a due process violation where a defendant's sentence was enhanced by the residual clause in the Armed Career Criminal Act if the prior felony "involved conduct that presented a serious potential risk of physical injury to another." *Id.* at 591. The residual clause violated due process because it required speculation in each case as to what could potentially cause injury in each set of circumstances. *Id*. at 598. The resulting ambiguity caused a wide range of interpretation and disparity among courts over the course of nine years and the Court acknowledged that the "failure of persistent efforts to establish a standard can provide evidence of vagueness." *Id.*

Similarly, the discussion above regarding what constitutes an "official proceeding" illustrates just part of the confusion and lack of cohesiveness among jurisdictions as to what does or does not qualify as an "official proceeding" under § 1512(c)(2). In each case, the courts have

9

had to speculate and attempt to distinguish "official proceedings" from other proceedings or investigations. While, as discussed above, courts have interpreted "official proceeding" to mean something more than an investigation and something more formal, there is no established standard, leaving ambiguity among the courts. *See United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006); *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019).

The vagueness of §1512(c)(2) is not limited to the confusion surrounding what constitutes an "official proceeding." The D.C. Circuit has acknowledged that the word "corruptly" is vague on its face as used in a similar statute, § 1505, that prohibits obstruction of a proceeding before departments, agencies or congressional investigations. The court held that "in the absence of some narrowing gloss, people must guess at its meaning and application." *United States v. Poindexter*, 951 F.2d 369, 398 (D.C. Cir. 1991). Previously, in *Ricks v. District of Columbia*, 414 F.2d 1097 (D.C. Cir. 1968), the court held a statute that criminalized "leading an immoral or profligate life" vague because it found "immoral" to be synonymous with "corrupt, depraved, indecent, dissolute, all of which would result in "an almost boundless area for the individual assessment of another's behavior." *Poindexter*, 951 F.2d. at 399 (quoting *Ricks*, 414 F.2d at 1097). The court explained that various dictionary definitions of the word "corrupt" did not reduce the confusion as to its meaning for purposes of the statute. *Id*. After an assessment of the legislative history and judicial interpretation, the court concluded that neither of those inquiries provided defendants with the constitutionally required notice that the statute requires, and found the term vague as applied to the defendant making false statements. *Id.* at 406.

Following *Poindexter*, Congress amended § 1515 to define "corruptly" for purposes of § 1505 only to mean "acting with an improper purpose, personally or by influencing another,

including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." However, this amendment did not resolve the vagueness that still exists in § 1512 as Congress did not amend § 1515 as it applies to § 1512.

Even though the D.C. Circuit later held that the word "corruptly" was not vague as applied, it was because in that case the defendant influenced a witness, which fit squarely within the non-vague category that *Poindexter* established. *United States v. Morrison*, 98 F.3d 619, 630 (D.C. Cir. 1996). In *Morrison*, the defendant tried to influence a witness's testimony and "exhorted her to violate her legal duty to testify truthfully in court." *Id*. The court in *Poindexter* explained that influencing another to "violate their legal duty" was not vague because "it would both take account of the context in which the term "corruptly" appears and avoid the vagueness inherent in words like "immorally." *Poindexter*, 951 F.2d at 379.

However, *Morrison* was not faced with the question of what "corruptly" means in § 1512(c), and does not resolve the ambiguity that the word presents in conjunction with the rest of the statute. The phrase "corruptly influences" does not resolve the ambiguity because "influence" alone is another vague word that may mean many things and lacks the definiteness of "influencing another to violate their legal duty" stated in § 1515. The various meanings of the word "influence" also support the inherent vagueness that exists in the statute especially within the context of January 6, 2021.

Many individuals who were there and not charged with obstruction were there to protest the vote and hoped that their voices would be heard, just like thousands of protests that have taken place in this country. So in a sense, that is a type of intended "influence," but it cannot be the intention of Congress to criminalize the right to peacefully protest to effect change. There must be something more, such as physically doing something to influence a proceeding, which is not captured by the statute because it simply says "influence."

The government's approach to charging defendants with violating § 1512(c)(2) based on the events on January 6, 2021, illustrates how vague and arbitrary the enforcement of this statute can be. While the government may contend it has some bright line rules, for example by charging individuals with a violation of § 1512(c)(2) if defendants entered the Senate floor, taking a look at the cases of some defendants who have been charged with a violation of §1512(c)(2) shows serious inconsistencies.  *See, e.g.*, *United States v. Robert Keith Packer*, 21-CR-103(CJN)(charging a defendant who was a few feet from Ashley Babbitt when she was shot deep inside the U.S. Capitol "only" with two misdemeanors);  The government does not specify what "influence" these defendants had or how exactly they "impeded" the proceedings. The inconsistent charging decisions along with the inherently vague words in the statute, as well as the vague "residual clause" that is the basis for charging these defendants all show that § 1512(c)(2) is unconstitutionally vague and does not provide fair notice to Mr. Blythe.

> **d.  Section 1512(C)(2) does not apply to this case because Mr. Blythe did not use a document, record, or other object in order to corruptly obstruct, impede or influence Congress's certification of the electoral vote.**

Mr. Blythe acknowledges that apart from one judge, all judges in this district, including this Court, have rejected the above arguments for dismissal of the § 1512(c)(2) count. *See, e.g., United States v. Puma,* No. CR 21-0454 (PLF), 2022 WL 823079, at *12 (D.D.C. Mar. 19, 2022) (collecting cases); *United States v. Montgomery,* No. CR 21-46 (RDM), 2021 WL 6134591, at *2 (D.D.C. Dec. 28, 2021)*.*

But some time ago, a judge dismissed this count in *United States v. Miller*, No. 1:21-CR-00119 (CJN), 2022 WL 823070, at *1 (D.D.C. Mar. 7, 2022). Mr. Blythe urges this Court to adopt the reasoning in *Miller.*

In *Miller*, the court found the word "otherwise" in §1512(c)(2) "critical to determining what §1512(c)(2) covers." 2022 WL 823070, at *6.  The court rejected the government's

suggestion that "otherwise" "serve[d] as a clean break between subsections (c)(1) and (2)." *Id*.  It explained that the government's proffered reading failed to "give meaning to the word 'otherwise,'" and rendered the word "pure surplusage." *Id*. at *7.  The court further reasoned that the government's reading was inconsistent with *Begay v. United States*, 553 U.S. 137 (2008), in which the Supreme Court concluded that the Armed Career Criminal Act's use of the word "otherwise" tied together the preceding and following words. *Id*. Specifically, *Begay* concluded that "the text preceding 'otherwise' influenced the meaning of the text that followed: it 'limited the scope of the clause to crimes that are *similar to the examples themselves*.'" *Id*. (quoting *Begay*, 553 U.S. at 143).  The court went on to explain why cases that adopted the "clean break reading of 'otherwise' in §1512(c)(2)" were incorrect. *Id*. at *7–8.

The court also rejected the government's alternative reading of the statute – "that subsection (c)(1) contains specific examples of conduct that is unlawful under subsection (c)(2)" such that that the "link between" the two subsections "is that the unlawful conduct must relate to an 'official proceeding.'"  *Id*. at*8 (citing *Montgomery*, 2021 WL 6134591, at *12).  As the court explained, the problem with this alternative reading is that it renders the word "otherwise" superfluous because both subsections contain the phrase "official proceeding." *Id*. at *9.

The court concluded that "[s]ubsection (c)(2) is a residual clause for subsection (c)(1)," operating as a "catchall for the prohibition contained in subsection (c)(1)." *Id.* Under this interpretation, consistent with *Begay*, the link between the two subsections is the conduct prescribed in subsection (c)(1), and "subsection (c)(2) operates to ensure that by delineating only certain specific unlawful acts in (c)(1) . . . —Congress was not 'underinclusive'" by allowing other ways to violate the statute that are similar to the conduct prohibited in (c)(1). *Id*. at *10.

Delving deeper, the court reasoned that the structure and scope of §1512 suggests that subsection (c)(2) has a narrow focus, because the other subsections criminalize specific conduct in narrow contexts. *Id*. at *11–12. The court further reasoned that while subsections (c)(2) and (c)(1) are different than the other subsections, because they prohibit an individual from taking certain actions directly rather than towards another person, the language in subsection (c)(1) still "homes in on a narrow, focused range of conduct." *Id*. at *11. The court explained that, by contrast, if § 1512(c)(2) "signals a clean break" from subsection (c)(1), it would be inconsistent with the statute as a whole because it would be the only provision to not contain a narrow focus. *Id*. at *12. The court reiterated that any different reading would improperly render subsection (c)(2) unnecessary. *Id*.

The court also discussed how the historical development of § 1512 supports the conclusion that § 1512(c)(2) operates as a catchall to (c)(1). *Id*. at *12–13. Per the court, the revisions to § 1512(c) in 2002 filled a gap that existed because § 1512(b) made it unlawful to cause "another person" to take certain actions but not for a person to take such action directly. *Id*. at *13. The 2002 enactment of § 1512(c) fixed that problem and took much of its language directly from § 1512(b). *Id*. The fact that Congress took much of the language from a provision already contained

in subsection (b), shows Congress's intent for subsection (c) to have a narrow, limited focus—just like subsection (b)(2)(B). *Id*.

Last, the court found that the legislative history also supports a narrow reading of subsection (c)(2). *Id*. at *13–14. The court explained the evolution of § 1512(c) resulted in a statute that ensured that individuals acting alone would be liable for the same acts that were prohibited in other parts of § 1512. *Id*. at *14.

For all those reasons, the court in *Miller* held that §1512(c)(1) limits the scope of (c)(2) and "requires that the defendant have taken some action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence an official proceeding." *Id*. at 15. The court also explained that, even assuming *arguendo* its interpretation was incorrect, at the very least the Court would be left with "serious ambiguity in a criminal statute" requiring lenity. *Id*. Because the government did not allege that Mr. Miller took any action with respect to records or documents or "other objects," the court held that the indictment failed to state an offense against him. *Id*.

Here, just as in *Miller*, the indictment does not allege or imply that Mr. Blythe took any action with respect to a document, record, or other object in order to corruptly obstruct, impede or influence Congress's certification of the electoral vote. Therefore, it fails to allege a violation of §1512(c)(2). Mr. Blythe respectfully urges this Court to adopt the analysis and reasoning set forth in *Miller*, and find that count ten fails to state an offense against him because there is no allegation that he took any action with respect to records or documents.

**II.**     <u>18 U.S.C. §1752 fails to state an offense</u>

    (1) **The United States Secret Service is the Entity that May Designate "Restricted Areas" Under the Statute, Not the United States Capitol Police**

Mr. Blythe is charged with two counts of violating 18 U.S.C. §1752 for "entering and remaining in a Restricted Building or Grounds," and engaging in "disorderly and disruptive conduct in a Restricted Building or Grounds."

When this statute was enacted, it is clear that the purpose was to designate the United States Secret Service ("USSS") to restrict areas for temporary visits by the President. *See* S. Rep. No. 91-1252 (1970). At the time of enactment, the USSS was part of the Treasury. Section 1752 grants the Treasury Secretary the authority to "designate by regulations the buildings and grounds which constitute the temporary residences of the President." 18 U.S.C. § 1752(d)(1). It also allows the Secretary to "to prescribe regulations governing ingress or egress to such buildings and grounds to be posted, cordoned off, or otherwise restricted areas where the President may be visiting." *Id.* § 1752(d)(2). There is nothing in the legislative history (or the statutory language) to suggest that anyone other than the USSS has the authority to so restrict the areas surrounding the Capitol building.

The USSS's duties and responsibilities are outlined in 18 U.S.C. § 3056, which include:

> (e)(1): When directed by the President, the United States Secret Service is authorized to participate, under the direction of the Secretary of Homeland Security, in the planning, coordination, and implementation of security operations at special events of national significance, as determined by the President.

> (2) At the end of each fiscal year, the President through such agency or office as the President may designate, shall report to the Congress--

> **(A)** what events, if any, were designated special events of national significance for security purposes under paragraph (1); and

> **(B)** the criteria and information used in making each designation.

16

*Id.* § 3056(e)(1)(2)(A)(B). The statute does not state that any other agency is permitted to designate events for security purposes and only explains that the USSS would be under the designation of the Department of Homeland Security instead of the Treasury Department. The statute makes the exclusive role of the USSS even clearer in § 3056(g), which states:

> (g) The United States Secret Service shall be maintained as a *distinct entity* within the Department of Homeland Security and shall not be merged with any other Department function. *No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service*, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department.

18 U.S.C. § § 3056(g) (emphases added).

### (2) The Government Does Not Allege that the Secret Service Restricted the Capitol Grounds on January 6, 2021

The Indictment charges Mr. Blythe with remaining or entering "restricted building or grounds," however it does not allege that the USSS designated that area as being restricted. Nor could it do so now because in *United States v. Griffen*, the government conceded that it was the United States Capitol Police that attempted to designate the area as restricted that day and not the USSS. 21-CR-92 (TNM), at Dkt. No. 33. The court in *Griffen* denied a motion to dismiss a §1752 charge on the ground that the statute (Congress) did not specifically state who must designate the "restricted areas." *Id*. at Dkt. No. 41.

However, the plain language of §1752(c)(1)(B), defines "restricted building or grounds" as a "building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." Since it is the Secret Service who protects the President or "other person," it is the Secret Service who must designate the area "restricted." The legislative history bolsters this interpretation. Congress enacted § 1752 as part of the Omnibus Crime Control Act of

1970. Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan 2. 1971). At that time, the USSS was a part of the Treasury Department. The Senate Judiciary Committee report accompanying the current version of § 1752 noted that there was no federal statute that specifically authorized the Secret Service to restrict areas where the President maintains temporary residences and the senators explained that the key purpose of the bill was to provide that authority to the Secret Service. S. Rep. No. 91-1252 (1970).

The court in *Griffen* hypothesized that the President would be unable to rely on the military fortification at Camp David already in existence when he visits that facility if the Secret Service was the only entity with the statutory authority to restrict the area. *See Griffen*, ECF Dkt. No. 41 at pg. 11. However, Camp David is a military installation and is not a "public forum" that needs an entity to "cordon off" areas and restrict them in light of a Presidential visit. Military bases have security and are not otherwise open to the public. And each military installation is subject to other laws that protect the facility, and those within it, from intruders. *See, e.g.*, 18 U.S.C § 1382 (barring any person from entering any military installation for any purpose prohibited by law). Military bases are heavily guarded and have entrance and exit points and are different than federal buildings that need sections to be "cordoned" off in order for the general public to know which area is restricted. For these reasons, the example offered by the *Griffen* court is inapposite and does not support the court's decision.

> (3) **Even if the Capitol Police were Authorized to Restrict the Grounds, 18 U.S.C. § 1752 is Not Applicable Because Former Vice President Pence Was not "Temporarily Visiting" the Capitol Building on January 6, 2021**

Under the plain language § 1752, the statute does not apply here. Section 1752 prohibits conduct in or near "any restricted building or grounds." The statute expressly defines the term "restricted buildings or grounds" as follows:

18

    (1)   the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

        (A) of the White House or its grounds, or the Vice President's official residence or its grounds;

        (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

        (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance.

18 U.S.C. § 1752(c); *see United States v. Samira Jabr*, Criminal No. 18-0105, Opinion at 12, ECF No. 31 (May 16, 2019), *aff'd*, 4 F.4th 97 (D.C. Cir. 2021).

Counts Five and Six of the Indictment charge Mr. Blythe with conduct "in a restricted building and grounds, that is, any posted, cordoned-off and otherwise restricted area *within the United States Capitol and its grounds, where the Vice President was temporarily visiting . . .*" *See* ECF No. 33 (emphasis added). The government's attempt to shoehorn Mr. Blythe's conduct into the statute fails. Accordingly, those two counts should be dismissed. The "United States Capitol and its grounds" do not automatically constitute "restricted buildings or grounds" under any prong of § 1752(c)(1). Nor did the Capitol grounds become "restricted grounds" on January 6, 2021, because of a "temporary vice-presidential visit."

The plain meaning of "temporary" is "lasting for a time only." Black's Law Dictionary (11th Ed. 2019). "Visiting" is defined as "invited to join or attend an institution for a limited time." Merriam-Webster (2021). Together, the phrase "temporarily visiting" connotes temporary travel to a location where the person does not normally live or work on a regular basis.

The former Vice President was not "temporarily visiting" the Capitol on January 6, 2021. The Capitol is a federal government building in the District of Columbia, where he lived and worked. Moreover, he actually worked at the Capitol Building and grounds—it was his place of

employment. In his official capacity as the "President of the Senate," he had a permanent office "within the United States Capitol and its grounds." The Vice President was not "visiting" the Capitol Building, he was working there, carrying out his sworn official duties to by "presiding," over the vote count ceremony. *See* 3 U.S.C. § 15 ("Congress shall be in session on the sixth day of January succeeding every meeting of the electors. The Senate and House of Representatives shall *meet* in the Hall of the House of Representatives at the hour of 1 o'clock in the afternoon on that day, and *the President of the Senate shall be their presiding officer*.") (emphasis added).

Past cases support this plain, common-sense reading of the statute, as they involve conduct in and near areas where the President and Vice President were clearly "temporarily visiting." *See, e.g., United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) (defendant entered and remained in a restricted area at an airport in South Carolina where the President was visiting for a political rally); *United States v. Junot*, 902 F.2d 1580 (9th Cir. 1990) (defendant pushed his way through a restricted area where then Vice President George Bush was speaking at a rally at a park in Los Angeles that was secured by United States Secret Service agents); *Blair v. City of Evansville, Ind*. 361 F. Supp.2d 846 (S.D. Indiana 2005) (defendant charged with § 1752 at protest during then Vice President Richard Cheney's visit to the Centre in Evansville, Indiana). These cases all involve the President and Vice President actually traveling outside of D.C., where they live and work, and "visiting" another location for a "temporary" purpose. As a result, those cases are entirely consistent with the plain meaning of § 1752(c)(1)(B).

Here, by contrast, former Vice President Pence was not traveling to a speaking event or a political rally. He was meeting with other government officials in a federal government building where he had a permanent office as part of fulfilling his official duties as Vice President/President

of the Senate. Thus, he was not "temporarily visiting" the Capitol building as required by the plain language of § 1752.

## <u>CONCLUSION</u>

This Court should dismiss counts five, six, and ten of the Indictment.

Respectfully submitted,

*Stephen F. Brennwald*

_____
Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, SE
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626 (facsimile)
sfbrennwald@cs.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing motion to dismiss was sent by ECF, this 28th day of October, 2022, to all parties of record.

*Stephen F. Brennwald*

Stephen F. Brennwald