**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-537 (JMC)** |
| **JASON BLYTHE,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jason Blythe to 108 months of incarceration, three years of supervised release, $2,000 of restitution, and a $210 special assessment.

## I.   INTRODUCTION

The defendant, Jason Blythe, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police ("Capitol Police" and ("USCP"). The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately

1

Blythe and his four co-defendants violently overran United States Capitol Police ("USCP") officers as part of the first breach of the Capitol's restricted perimeter on January 6, 2021. He was among the first rioters through the restricted perimeter at approximately 12:53 p.m. After passing through an unmanned line of fencing, he approached a second line of linked, metal bike-rack fencing covered in snow fencing and "Area Closed" signs. Blythe watched as his four co-defendants lifted the metal barricades into the air above the heads of the few, sorely outnumbered officers on the other side of the barricades. When he saw their impending assault on these officers, he deliberately joined it. He moved to the middle of his four co-defendants, grabbed two linked barricades, and added his force to theirs as they shoved the barricades into the officers and drove them back several feet.

This was an immensely consequential assault. Within minutes, hundreds if not thousands followed Blythe and his co-defendants down the Pennsylvania Avenue Walkway as police fell back to the West Front closer to the Capitol building. Rioters quickly engulfed the west side of Capitol grounds and drove Congress to a halt little more than an hour later.

Joining this assault at the Peace Circle was not a brief lapse in judgment for Blythe. After ramming the fencing into officers, Blythe continued battling against officers by aiding co-defendant Stephen Randolph's attack on USCP Officer David Cruz. When that attack ended, and officers were forced to retreat, Blythe pressed forward onto the West Front and remained there for

---

$629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

hours. At 4:38 p.m.—nearly four hours after the Peace Circle assault— multiple officers had to forcibly remove Blythe from a location on the Upper West Terrace as he fought their efforts to clear the area.

The government recommends that the Court sentence Blythe to 108 months' incarceration for his convictions for Count One, Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3); Count Three, Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b); and Count Nine, Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F).

## I.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts filed with Blythe's April 16, 2021 Complaint, (ECF No. 1, 21-mj-00382-RMM) for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters seeking to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.   Blythe's Role in the January 6, 2021 Attack on the Capitol

In advance of January 6, 2021, Blythe traveled from his home near Dallas, Texas to Washington, D.C. Shortly after 9 a.m. on the morning of January 6, Blythe and a friend first went to the Ellipse area near the White House, where former President Trump was holding the "Save America" rally. That day, Blythe wore a green, camouflage army jacket, a green army helmet, and soft body armor concealed underneath his clothing. Blythe approached the U.S. Capitol at approximately 12:40 p.m., arriving at the Peace Circle area where a crowd had gathered at the edge

of the restricted perimeter established around the Capitol building.



*Image # 1: Still image from open-source video of Blythe at the western edge of the Pennsylvania Avenue Walkway on Jan. 6, 2021*

Individuals with megaphones started chants and encouraged the crowd to move past the perimeter and toward the building. After arriving at the Peace Circle, Blythe stood near the front of the crowd closest to the barricades marking the restricted perimeter and took a photo of officers manning the barricades with white "Area Closed" signs attached to them.



*Image # 2: Image recovered from Blythe's cell phone*

At approximately 12:53 p.m., co-defendant Ryan Samsel opened a section of the first metal bike rack barricade at the sidewalk across from the Peace Circle statue and walked onto the restricted Capitol grounds, followed by co-defendant Grant, marking the very first breach of the restricted perimeter and the beginning of the riot that interrupted the certification proceedings. Gov. Exhs. 201, 204, 302, 306, 309, 340. The officers descended the stairs to man the barricade on the Pennsylvania Avenue Walkway, and Sergeant Tim Lively moved from the West lawn to join them. Gov. Exhs. 201, 204, 309, 340. Blythe, Johnson, co-defendant Stephen Randolph, and other rioters followed Samsel and Grant and made their way to the front of the crowd and confronted officers at the barricade of linked bike racks that the officers stood behind. Gov. Exh. 308.

Rioters aggressively confronted the few officers guarding the walkway and began pushing and pulling on the metal barricade. As his codefendants lifted the linked bike racks across from Officers Edwards and Cruz, Gov. Exhs. 302, 308, 309, Blythe rushed forward and grabbed the

metal bike racks in between Johnson and Grant. The five defendants together drove the metal barricade into the officers. Gov. Exhs. 302, 308, 309. Blythe was directly across from Officer Cruz as he pushed the metal barricade against the officers.



*Image # 3: Still from Government Exhibit 302 at 59 seconds*

Blythe continued to push until that effort drove Sergeant Lively and Officer Cruz several feet backwards and ran the back of Officer Cruz's body into the stairwell and handrail behind him. Samsel and Randolph's simultaneous push against Sergeant Edwards made the linked bike rack strike her face, causing her to reel backwards and fall. As Sergeant Edwards fell, she struck her head on the handrail before falling to the stairs below.

As Sergeant Edwards lay injured on the ground, Randolph jumped over the fallen barricade and attacked Officer Cruz. Sergeant Lively came to Officer Cruz's aid, trying to pull Randolph off Officer Cruz. At the same time, Blythe and Grant rushed to Randolph's aid, grabbing at Randolph, Officer Cruz, and Sergeant Lively, and interfering with the officers' efforts to remove Randolph

from Officer Cruz, as shown below in Image # 4. Blythe continued to grab and pull at Randolph

and the two officers until another officer intervened by punching Grant until he released Officer

Cruz, which disrupted the attack and allowed Officer Cruz to escape.



*Image # 4: Still from Government Exhibit 302 at 1 minute 12 seconds (Blythe circled in red;*
*Officer Cruz circled in blue)*

Because of Blythe and his co-defendants' success in bringing down the metal barricade,

defendants and the rest of the rioters quickly overwhelmed the police line. The USCP officers

retreated toward the Capitol building. Blythe quickly continued down the Pennsylvania Walkway

toward the Capitol's West Plaza, where officers had established a new defensive line. Metropolitan

Police Department ("MPD") officers began to arrive at the West Front by approximately 1:15 p.m.

to provide reinforcements.



*Image # 5: Open-source image showing Blythe on the Pennsylvania Avenue Walkway heading to the West Plaza*

Within minutes of arriving at the West Plaza, where the crowd of rioters fought against police defending the Capitol building, Blythe climbed the media tower erected in the middle of the West Plaza. Between 1 and 1:45 p.m., when Blythe stood on the media tower and intermittently took photos and videos using his phone, his high vantage point provided an uninterrupted view of the rioters' widespread violence against police in the West Plaza below him. At some point, Blythe acquired a flagpole with a yellow "Gadsden" flag and a Texas state flag attached to it, which he waived from the tower.



*Image # 6: Still from open-source video showing Blythe on West Plaza media tower*

USCP and MPD maintained a police line on the West Plaza using bike rack barricades until the line was broken at approximately 2:30 p.m., after which rioters were able to gain access to the Lower West Terrace and Upper West Terrace through staircases behind the police line. Blythe remained on restricted Capitol grounds, moving between the West Plaza, Lower West Terrace, and Upper West Terrace for at least three and a half hours that day.



*Image # 7: Still from open-source video showing Blythe on the Upper West Terrace holding a flagpole with Texas and Gadsden flags*

At 4:38 p.m., Blythe and several other rioters stood on an elevated platform on the Upper West Terrace as police attempted to clear the area. Blythe ignored and argued with police as they attempted to direct Blythe and other rioters off the platform. Then, when police began to physically remove a woman standing near Blythe, he placed his arms around the woman's torso in an attempt to impede police from removing the woman.



*Image # 8: Still from MPD body-worn camera footage showing Blythe with his arms wrapped around a rioter as police attempt to remove her*

When an officer attempted to grab Blythe by the jacket to remove him, Blythe batted the officer's hand away.



*Image # 9: Still from MPD body-worn camera footage showing Blythe's right hand (circled in red) swatting away the left hand of an MPD officer attempting to grab Blythe's jacket*

The officer reached out again for Blythe, who dropped to the ground as he fought to prevent

11

the officer from removing him. The officer was then able to pull Blythe toward other MPD officers, who attempted to subdue noncompliant Blythe as he continued to fight against them.



*Image # 10: Still image from MPD body-worn camera footage showing Blythe struggling against MPD officers attempting to remove Blythe from the platform on the Upper West Terrace*

As Blythe fought against officers, his camouflage jacket lifted and revealed a soft body armor vest concealed underneath his outer layer of clothing, as MPD Sergeant Luke Foskett testified at trial (ECF No. 322 at 92:1-93:14), and as the Court stated in its Findings of Fact & Conclusions of Law (ECF No. 345 at 8).



*Image # 11: Still from MPD body-worn camera footage showing Blythe struggling against MPD officers when Blythe's jacket is pulled up to reveal body armor worn underneath (circled in red)*

### Defendant's Statements and Related Activity

On January 7, 2021, Blythe texted photographs of bruising on his legs and left arm that he claimed were from "rubber bullets from a concussion grenade." After stating that police "manhandled" people in the crowd, Blythe also commented favorably on assaults against police, stating: "[t]wo cops got 'arrested by the crowd though, so the score was even."

## II.   THE CHARGES AND CONVICTION

On February 15, 2023, a federal grand jury returned a fourth superseding indictment charging Blythe with nine counts, including, Count One, Obstructing Officers during a Civil Disorder, 18 U.S.C. § 231(a)(3), Count Three, Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b), and Count Nine, Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F). On February 2,

2024, Blythe was convicted of those three offenses following a bench trial.[2]

## III.   STATUTORY PENALTIES

Blythe now faces sentencing on Count One, Obstructing Officers during a Civil Disorder, 18 U.S.C. § 231(a)(3); Count Three, Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b); and Count Nine, Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F).

As noted in the Presentence Report ("PSR"), Blythe faces up to 5 years of imprisonment for Count One, 20 years of imprisonment for Count Three, and a term of supervised release of not more than three years, a fine up to $250,000, restitution, and mandatory special assessments of $100 for each felony conviction. The defendant also faces up to 6 months' imprisonment and a $10 special assessment for Count Nine. ECF No. 381 (PSR) at 2.

---

[2] Blythe was acquitted of Count Two, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, Inflicting Bodily Injury, and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(l) and (b) and 2 (for the assault of Sergeant Edwards); Count Five, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A); Count Six, Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ l752(a)(2) and (b)(l)(A)); Count Seven, Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, Resulting in Significant Bodily Injury, and Aiding and Abetting, in violation of 18 U.S.C. §§ 1752(a)(4), (b)(l)(A), (b)(l)(B), and 2; Count Eight, Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Ten, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512( c)(2) and 2. *See* ECF No. 341.

14

### IV.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Government agrees with the offense level (30) and Guidelines range (97-121 months' imprisonment) in the draft PSR. However, the PSR mistakenly groups Counts One and Three pursuant to U.S.S.G. § 3D1.2(b), based on the counts having the same victim. PSR ¶ 76. These counts, however, involve different victims: Officer Cruz is the sole victim in Count Three, but as identified in the Fourth Superseding Indictment and the Court's Findings of Fact and Conclusions of Law, Blythe's victims for Count One—the officers who Blythe obstructed, impeded, or interfered with when overrunning the police line near the Peace Circle—included Sgt. Lively,[3] Officer Cruz, and "other officers who formed the police line at the second barricade." ECF No. 345 at 15. Nevertheless, Counts One and Three do group pursuant to U.S.S.G. § 3D1.2(c) because Count Three (the assault of Officer Cruz with a metal crowd control barrier) embodies conduct that is treated as a specific offense characteristic in the guideline applicable to Count One (specifically, the four-level enhancement for use of a dangerous weapon in U.S.S.G. § 2A2.2(b)(1)(B)).

The Government's Guideline Calculation is as follows:

---

[3] As noted above, Johnson and Grant lifted the portion of the metal bike rack barricade (which weighed 25-50 pounds) off the ground across from Sergeant Lively and Officer Cruz and used the barricade to drive both of the officers back several feet until the officers' backs hit the stairwell.

Count One: 18 U.S.C. § 231(a)(3)

| U.S.S.G. § 2A2.2(a)[4] | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **24** |

Count Three: 18 U.S.C. § 111(b)

| U.S.S.G. § 2A2.2(a)[5] | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | §111(b) Conviction | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3B1.5 | Use of Body Armor | +4 |
| | **Total** | **30** |

---

[4] Because no applicable Chapter Two Guideline exists in the Statutory Appendix for this offense, "the most analogous guideline" should be used. U.S.S.G. § 2X5.1. Here, the most analogous guideline for 18 U.S.C. § 231(a)(3), Obstructing Officers During a Civil Disorder, is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers." The cross-reference in U.S.S.G. § 2A2.4(c)(1), directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. The commentary to § 2A2.2 defines aggravated assault as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon…or (D) an intent to commit another felony." U.S.S.G. § 2A2.2, cmt., n.1. Here, the conduct includes the felonious (punishable by up to 20 years' incarceration pursuant to 18 U.S.C. § 111(b)) assault of Officer Cruz, which involved a dangerous weapon with intent to cause bodily injury (Blythe, Johnson, and Grant pushed Officer Cruz with the heavy metal barricade so hard that the officer was forced back into the handrailing on the stairs behind him); and an intent to commit another felony aside from the assault (Obstructing Officers During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3)). Accordingly, the aggravated assault cross reference applies and § 2A2.2 is the correct guideline.

[5] As discussed above, the cross-reference in U.S.S.G. § 2A2.4(c)(1) directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault, and the assault of Officer Cruz here qualifies as aggravated assault. *See also United States v. Stevens*, 105 F.4th 473, 474–75, 480–81 (D.C. Cir. 2024) (finding that 18 U.S.C. § 231 is "another felony" for purposes of applying the cross-reference to § 2A2.2 and affirming application of the § 2A2.2 guideline to a rioter's assault where he acted "with intent to commit civil disorder under Section 231(a)(3).").

As discussed above, Counts One and Three form a single group. Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the group is the offense level "for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." Here, Count Three, the assault of Officer Cruz with a dangerous weapon, has the highest offense level: 30. Thus, the offense level for the group is 30.

*Inapplicability of U.S.S.G. § 4C1.1*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because (1) Blythe used violence and credible threats of violence in connection with the offenses, in contravention of § 4C1.1(a)(3); and (4) Blythe possessed a dangerous weapon (the heavy metal barricade) in connection with the offenses, in contravention of § 4C1.1(a)(7).

*Guidelines Range*

The U.S. Probation Office calculated the Blythe's criminal history as category I, which is not disputed. PSR ¶ 90. Accordingly, based on the government's calculation of Blythe's combined offense level as 30, the Sentencing Guidelines recommended sentencing range for Blythe is 97 to 121 months' imprisonment. The PSR contains the same estimated Guidelines range. PSR ¶ 130.

## V.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The nature and circumstances of Blythe's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 108 months of incarceration.

As shown in Section II(B) of this memorandum, Blythe's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.

Moreover, Blythe participated in the first breach of the restricted perimeter and first act of violence against Capitol Police, opening the floodgates for thousands of rioters that followed; the removal of the Vice President, members of Congress, and their staff to secure locations within the Capitol's restricted perimeter; and the unprecedented cessation of Congress' certification of the 2020 presidential election. Blythe stayed at the Capitol for hours, despite his claims of getting hit with rubber bullets and concussion grenades, and at one point had to be forcibly removed as he fought against multiple officers trying to clear him and other rioters from the Upper West Terrace.

Throughout that day, Blythe ignored ample opportunities to cease participating in the infamous events at the U.S. Capitol. At 12:48 p.m., after taking a photo of police defending the bike rack barricades at the Peace Circle, he could have stopped there, but he chose to join the violent attack against them. After participating in the assault 10 minutes later, he could have left the Capitol grounds and proceeded no further, but instead he pressed further toward the Capitol building. On the West Plaza, when he was hit with non-lethal crowd control munitions, he could have dispersed, but instead he remained until the police line broke and he was able to access the

Upper West Terrace closer to the building. And at 4:38 p.m., when police told Blythe he needed to leave the Upper West Terrace platform peacefully, he could have complied, but instead he violently resisted until he was dragged off the platform. These are just a few of the decision points where Blythe was presented with a clear choice, and each time he chose to continue to actively participate in the violent riot at the Capitol. The nature and circumstances of Blythe's conduct on January 6 are extremely serious and warrant a substantial term of incarceration.

### B.  The History and Characteristics of the Defendant

Blythe is 29 years old and resides outside Dallas, Texas. He is a high school graduate and possesses a welding certification from the Lincoln Institute of Technology. Blythe currently works as a delivery driver and has no criminal history. Blythe reported no physical, mental, or substance abuse issues. Further, unlike many criminal defendants that appear before this Court for sentencing, Blythe had the benefit a stable upbringing in a two-parent household he described as a "good home," yet he still chose to travel across the country, from Texas to Washington, D.C., in order to join in the violent disruption of Congress's Joint Session on Jan. 6, 2021. Accordingly, there are no special considerations here which weigh against a sentence within his recommended Guidelines range.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense
and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of
incarceration. Blythe's criminal conduct on January 6 was the epitome of disrespect for the law.
*United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was
simply a political protest, simply an episode of trespassing in a federal building. What this was
was an attack on our democracy itself and an attack on the singular aspect of democracy that makes
America America, and that's the peaceful transfer of power.") Blythe played no small role in this
attack. In fact, he and is co-defendants took the first steps to turn the protest into a violent riot,
which eventually halted the certification of the electoral college certification, and injured and
endangered numerous police officers.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by
others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving
domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general
deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out
of the violent riot at the Capitol.

---

[6] *See* 18 U.SC. § 2331(5) (defining "domestic terrorism").

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Blythe has never expressed any remorse for his conduct on January 6, 2021. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). He has never expressed that he appreciates the gravity of his conduct—the level of violence he used and its larger impact on the events of January 6, and any such statement at sentencing should be viewed with skepticism. Blythe's absence of remorse is a strong indication that his case requires a sentence from repeating his criminal conduct in the future.

Additionally, Blythe arrived at the Capitol anticipating violence, as evidenced by his helmet and body armor. The potential for violence on January 6 did not deter Blythe from illegal activity. This Court should fashion a sentence that will.

As detailed above, Blythe engaged in more than just one poor decision and cannot be grouped with those who might argue they were simply swept up in a single bad moment. Blythe consciously made a *series* of decisions that day—remaining on restricted Capitol grounds for hours, observing and engaging in violence against officers while those officers were working to secure the Capitol from the thousands of rioters that outnumbered them at every turn. After the riot ended, and after Blythe witnessed the injury inflicted on Sergeant Edwards and additional violence against additional officers, he made light of those assaults. Accordingly, the Court should impose a sentence that ensures Blythe is deterred from committing violence again.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.        Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide helpful comparisons to the relevant sentencing considerations in this case.

In *United States v. Christopher Alberts*, 21-cr-26, Judge Cooper sentenced Alberts to 84 months of incarceration (after calculating the recommended Guidelines range at 78 to 97 months of incarceration) for violations of 18 U.S.C. §§ 111(a)(1) and 231(a)(3), among other offenses. Judge Cooper found salient that Alberts, like Blythe, was a major participant in a significant breach as the first rioter to physically confront police at the top of the Northwest Stairs, near the first breach point of the Capitol building at the Senate Wing Door. Judge Cooper also pointed to the

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

fact that Alberts spent several hours on Capitol grounds during the course of the riot, just as Blythe did. Although Alberts sought a downward variance pursuant to U.S.S.G. § 5K2.20, Judge Cooper denied it on the basis of Albert's preplanning for the riot; Blythe similarly prepared himself for the violent riot by outfitting himself in an army helmet, camouflage army jacket, and body armor.

In *United States v. Christopher Quaglin*, 21-cr-00040, Judge McFadden sentenced the defendant to 144 months of incarceration followed by two years of supervised release and $2000 in restitution for violations of 18 U.S.C. §§ 111(a), 111(b), 1512(c)(2),[9] and 231, among other statutes, for which he faced a recommended Guidelines range of 168 to 210 months. The defendant in *Quaglin* was in the initial group of rioters who stormed the Capitol at Peace Circle and assaulted several officers on the West Front by choking one officer to the ground, pulled a bike rack away from an officer and then rammed it into a line of more than a dozen officers. The defendant also attacked officers in the tunnel by pulling a shield away from an officer and spraying chemical irritants in the officers faces. The defendant came prepared for the riot wearing tactical gear and encouraged others to do the same. After January 6, he continued to boast and brag about his conduct, both blaming officers for the riot while simultaneously taking pride in his actions and conduct. Like *Quaglin*, Blythe appeared to relish in assaultive conduct on officers, remarking that the rioters and police were "even" because rioters had "arrested" two police officers during the

---

[9] Blythe was acquitted of Count Ten, charging him with violating 18 U.S.C. § 1512(c)(2), but the government is not asking this Court to consider Blythe's acquitted conduct in fashioning an appropriate sentence. *Quaglin* also remains a suitable case for comparison notwithstanding Quaglin's conviction under Section 1512(c)(2). In addition to the similarities in conduct noted above, Quaglin's Section 1512(c)(2) conviction did not drive Quaglin's offense level and had only a minor impact on Quaglin's recommended Guidelines range.

day as well. And as with Quaglin, Blythe's military garb and armor worn that day speak to the violent intentions he later acted upon at the Capitol in assaulting officers.

In *United States v. Craig Bingert et al.,* 21-cr-91, Bingert was also convicted of violating 18 U.S.C. §§ 231(a)(3) and 111(a)(1) (as well as receiving an additional 18 U.S.C. § 1512(c)(2) conviction) for attacking officer guarding barriers. Similar to Blythe, Bingert worked with other rioters/his co-defendants to lift metal bike rack barricades and push them into a line of police officers (Bingert attacked officers at the top of the stairs leading to the Upper West Terrace). After attacking police, Bingert remained on restricted Capitol grounds, specifically the West Front, for hours; and Bingert watched violence for a sustained period of time (almost an hour), including observing as an officer was dragged into the crowd. Bingert's assault caused one minor injury to officers. However, Blythe's behavior was still more aggravated because Blythe was part of the first group of rioters to breach the restricted perimeter that day; he was part of the very first violent breach and attack of police that day, and he wore tactical gear – specifically body armor and a helmet – indicating that Blythe was prepared for and expecting violence ahead of time. These facts support a sentence greater than the sentence Bingert received of 96 months of incarceration.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291

§ 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Since Blythe was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of

27

loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[10]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. §

---

[10] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Blythe to pay $2,000 in restitution for his convictions on Counts One and Three. This amount fairly reflects Blythe's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.   FINE

Blythe's convictions subject him to a statutory maximum fine of $250,000 each for Counts One and Three, and a maximum fine of $5,000 for Count Nine. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the Court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

29

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $25,000 to $250,000. U.S.S.G. § 5E1.2(c).

## VIII.   CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence Jason Blythe to 108 months of incarceration, three years of supervised release, $2,000 restitution, and a mandatory assessment of $100 for each felony conviction and $10 for his class B misdemeanor conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     */s/ Hutton Marshall*
        J. HUTTON MARSHALL
        KYLE R. MIRABELLI
        ALEXANDRA FOSTER
        Assistant U.S. Attorney
        U.S. Attorney's Office for the
        District of Columbia
        DC Bar No. 1721890
        601 D Street N.W.
        Washington, D.C. 20579
        (202) 809-2166
        Joseph.hutton.marshall@usdoj.gov