UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                          :

    v.                                 :  Crim. No. 21-537 (JMC)

JASON BLYTHE                           :

## MEMORANDUM IN AID OF SENTENCING

COMES NOW Defendant, Jason Blythe, through undersigned counsel, Stephen F. Brennwald, Brennwald & Robertson, and submits the following Memorandum in Aid of Sentencing.  Defendant argues herein that under the unique circumstances of his case, a sentence of 12 months and 1 day, followed by a one-year period of home confinement, followed thereafter by a period of supervised release and an order of restitution, would constitute a sentence that is sufficient, but not greater than necessary, to accomplish the goals enumerated in 18 U.S.C. § 3553(a).

### Background

Mr. Blythe is before this Court after having been convicted one count of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3),  Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. §§ 111(a)(1) and (b), and one count of Act of Physical Violence, in violation of 40 U.S.C. 5104(e)(2)(F).

The evidence at trial, captured in a video recording of the scene, showed that on January 6, 2021, Mr. Blythe saw a group of people who had already lifted up several

sections of bike racks that had been placed on the ground on the West side of the Capitol
to prevent people from entering that area.

After he saw others holding up the bike racks and moving forward, Mr. Blythe
walked forward, placed his hands on one of the racks, and pushed forward for a period of
about 5 seconds.

The evidence is clear that the bike racks had already been lifted up before Mr.
Blythe touched them.



Thereafter, when one of the men (apparently co-defendant Randolph) went over
the bike racks and was struggling with police officers, Mr. Blythe tried to pull that him
away from the officers.  Contrary to what the government claims,[1] Mr. Blythe did not try

---

[1] Gov't Mem. at 6.

to assault any officers at all.  He actually tried to pull Mr. Randolph back over to his (Blythe's) side of the bike racks.



There is no question that the scene was chaotic, and unfortunately the video of the incident pans away from the scuffle for a period of time, but there is no evidence that Mr. Blythe tried to touch any officers.

Mr. Blythe did not know Mr. Randolph, but he saw that Mr. Randolph was in a scuffle with officers and tried to separate the men.

Mr. Blythe never tried to climb over the bike racks at that point, and was merely reacting spontaneously to the rapidly unfolding scene before him.



Shortly after the above scene, the barriers were knocked down and many people started going over them.  Mr. Blythe was not among the first to go over them, but he did eventually go over the downed racks and closer to the Capitol.



***(The above picture shows that Mr. Blythe was not among the first over the racks)***

At the time of these events, Mr. Blythe was wearing a green camouflage jacket, a helmet with the Texas star, and soft body armor.

Mr. Blythe wore these items only because he had learned that during prior political events there had been confrontations, and he did not want to be injured in case other individuals became violent.  As the Court may recall, Mr. Blythe, who was 25 years old at the time of these events, is 5'11'' tall but only weighs 120 pounds.  He knew he could not survive if someone tried to hurt him, and did his best to wear something that would protect him.

After a group of people crossed the bike racks, Mr. Blythe followed them, and eventually ended up at the base of the West side of the Capitol.

He later walked up to a wall that overlooked the entire National Mall area, and stood up there for several hours, watching what was unfolding around him.

He never threw any object at anyone – whether a flagpole, a frozen bottle of water, a stick, a police shield, or any other potentially dangerous item.

 He also never shouted slogans, joined in chants, or otherwise acted in a way that indicated anger or hate at the government.

What he did do was stand at the top of that wall area, basically standing still.

He was eventually removed from that area by force, and thrown to the ground, as video evidence demonstrated at trial.

While an officer who testified about his interaction with Mr. Blythe on the upper West terrace tried to claim that Mr. Blythe assaulted him or otherwise acted violently, this Court saw clear evidence that Mr. Blythe remained motionless throughout the time

the police tried to remove him, other than one time when he put his arm around woman the police were trying to remove from the wall.  The police then pulled Mr. Blythe off of the wall, took him toward the underside of an area of scaffolding, and then threw him to the ground.

Finally, the government notes that after the events, Mr. Blythe talked about having been hit by rubber bullets, but joked with a friend that it was ok because two officers had been "arrested."  While this comment was unfortunate, it was born of the physical pain Mr. Blythe was experiencing as he drove back to Texas for many hours.  The following photograph shows the injuries Mr. Blythe received as a result of having been shot with rubber bullets:

(See next page)



***The Guidelines***

The probation office calculated the guidelines as follows:

**Base Offense Level**: The guideline for 18 USC § 231(a)(3) offenses is found in

USSG §2A2.2 of the guidelines.                    **The base offense level is 14**.

**Specific Offense Characteristics**: The defendant used a dangerous weapon [to wit: a metal bike rack barricade as a deadly or dangerous weapon]. Therefore, four levels are added. USSG § 2A2.2(b)(2)(B).                              **+4**

**Specific Offense Characteristics:** The defendant was convicted under 18 U.S.C. § 111(b). Therefore, two levels are added. USSG § 2A2.2(b)(7).                              **+2**

**Victim Related Adjustment**: Because, in a manner creating a substantial risk of serious bodily injury, the defendant or a person for whose conduct the defendant is otherwise accountable, knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight there from [to wit: Officer DC was a USCP officer protecting the US Capitol acting in the course of his official duties], six levels are added. USSG §3A1.2(c)(1).                              **+6**

**Adjustment for Role in the Offense**: The defendant used body armor during the commission of the offense, in preparation for the offense, or in an attempt to avoid apprehension for the offense; therefore, increase by four levels. USSG §3B1.5(2)(B).                              **+4**

**Adjustment for Obstruction of Justice**: None.                              **0**

**Adjusted Offense Level (Subtotal):**                              **30**

**Chapter Four Enhancement:** None.                              **0**

**Acceptance of Responsibility**: As of completion of the presentence investigation, the defendant has not clearly demonstrated acceptance of responsibility for the offense. USSG §3E1.1.                              **0**

As this Court is aware, defendant has objected throughout trial that he is guilty of a violation of §111(b) of the federal assault statute.  He therefore continues to object to the application of several special offense characteristics to his guidelines, to wit:  The 4-level enhancement for use of a bike rack as a deadly or dangerous weapon, the 2-level enhancement for a §111(b) conviction, as well as the 4-level enhancement for use of body armor.

Defendant relies on his prior arguments, as well as on the prior and current arguments of his co-defendants, with respect to the first two enhancements listed above. Regarding the body-armor enhancement, defendant argues that it should not apply because the defendant did not wear the body armor with any ill motive or evil purpose, or because he intended to commit a crime when he put it on that morning.

He wore it solely for defensive purposes.  As such, it would be inappropriate to punish him for taking measures to protect himself in case he was attacked by counter-protestors (who were expected at the rally that day).

Therefore, he argues that his total offense level should be 20.  With no criminal history, his guidelines should be 33 to 41 months.

### *Analysis of Sentencing Factors*

As this Court knows, pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and *Gall v. United States*, 128 S.Ct. 586, 596-97 (2007), not only are the United States Sentencing Guidelines no longer mandatory, they are not even presumptively reasonable. In determining an appropriate sentence, this Court must consider the factors delineated in 18 U.S.C. § 3553(a), and impose a sentence that:

1) reflects the seriousness of the crime;

2) promotes respect for the law;

3) provides just punishment;

4) deters criminal conduct;

5) protects the public from further crimes, and

6) provides the Defendant with any necessary educational or vocational training, medical care, or other correctional treatment.

In addition, this Court must also consider

1) the nature and circumstances of the offense;

2) the history and characteristics of the defendant;

3) the kinds of sentences available;

4) the sentencing range;

5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and

6) the need to provide restitution to any victims of the offense.

### *The Proposed Sentence Would Reflect the Seriousness of the Crime*

Mr. Blythe's conduct, when viewed in context, was different, and less severe, than the actively assaultive behavior of many of the January 6 defendants who have been charged with assaulting officers that day.

For instance, many defendants physically punched officers. Some sprayed officers in the face with an extreme irritant. Others beat officers with objects. Yet others choked,

kicked, restrained, and otherwise assaulted officers.  Their actions were direct, and violent.

While Mr. Blythe's actions in pushing the bike racks for a period of 5 seconds could have injured an officer, they, in fact, did not.  Nor did he have any intent to hurt an officer.  He was clearly pushing the bike racks in an effort to get past them, which was illegal, but he did not do so in an effort to hurt anyone, including any law enforcement officer.

The government states that this initial breach allowed many others to come onto the grounds, and that is true.  But that was not Mr. Blythe's intent at the time, nor did he realize how his five-second push would in some small way contribute to the chaos that ensued on that side of the Capitol that afternoon.

To pin everything that happened there on him vastly overstates his responsibility for that day's events.  His actions were illegal and unacceptable, but they were never intended to cause or contribute to the problems that occurred later that day.

Further, his presence on the Upper West Terrace was not violent, and it did not involve vocal protesting or any urging of the crowd to act in a disorderly manner.

He should have left the premises when officers asked him and the others on that wall to leave, but his "resistance" at that point was clearly passive, rather than active.

Mr. Blythe, defendant submits, is not a man inclined to violence – at all.  While counsel realizes that the Court does not know Mr. Blythe at all, it should know that he is a very gentle person who is sensitive to other creatures, whether people or animals.

For several years, for example, Mr. Blythe has raised chickens for their eggs.  He loves his chickens, and tried to make their lives as comfortable as possible.  He is not violent in any way, nor does he have a history of violence.

This Court should know (as it was not mentioned in the presentence report) that when he was about 2 years old, Mr. Blythe suffered from chronic ear infections.  They were not treated properly, it seems, and as a result, Mr. Blythe was unable to hear sounds normally.  This caused his speech development to be delayed, and when he eventually was able to hear and speak, his "accent" was atypical of that spoken by a native speaker of American English.

When he speaks, one would think (as counsel did when he first spoke with Mr. Blythe several years ago) that he is English, rather than American.

This led to teasing and other childhood trauma that has left a lasting impact.  It also likely led to his gentle demeanor, given the fact that he was usually bullied or otherwise made fun of.  This was a result not only of his hearing, but of his very slight frame.

The following pictures perfectly capture Mr. Blythe's character and spirit.





Unlike many of the other folks who were at the Capitol that day, Mr. Blythe was not in a state of rage or prepared to do battle.  He went to the rally to support the former president.  While he did wear "soft" body armor, he did so, again, because he was worried about being attacked by counter-protestors.  At his size, he is not able to handle any kind of assault, and is at significant risk of injury if attacked.

This, of course, should have led him to avoid this event altogether, but it did not.

As of today, counsel can attest that Mr. Blythe is very remorseful for his involvement in the day's events, and truly wishes he had never gone.  He and his family were shocked to learn that he is potentially facing years in prison because of his presence and actions that day.

His mother, especially, is frightened at her son's chances of survival were he to be imprisoned with larger and tougher men in a regular medium-security prison.  He is practically the prototype of the type of person a sexual predator would seek out in a prison environment.  Because of this, and because his actual conduct – five seconds of pushing against a bike rack, as well his mostly passive presence on the Capitol ground for several hours – he submits that a sentence of one year and a day in prison, followed by a period of home confinement, and eventually a period of supervised release, would adequately reflect the seriousness of his conduct.

Any more than that and he would risk being sent to an FCI where the dangers increase exponentially.

The proposed guideline range of 97 to 108 months is wildly excessive in light of all of the circumstances surrounding this case.

***The Proposed Sentence Must Also Promote Respect for the Law, Provide Just Punishment to Mr. Blythe, and Deter Criminal Conduct, both by him and by Others.***

Defendant submits that his arrest and convictions of two felonies already constitute a significant punishment to someone like him.  He will forever be a felon because at the chronological age of 25 (but the mental age of 14, in counsel's view), he was fooled by a person who lied to his followers and led them to behave in ways many of them would have never normally behaved.

This is certainly true of Mr. Blythe who, before this, had never demonstrated any violent or criminal tendencies whatsoever.  Until January 6, 2021, he had lived a law-abiding life, and never imagined that he would ever become a felon.

Since he was released in this case he has held various jobs, and commendably earned a welding certificate.  He has also supported his family by raising chickens.

He lives with his parents to this day, and has never had a girlfriend.  He is not a loner, but he is extremely lacking in confidence – something that would make him an easy target in a prison setting.

As to his actions on that day, he, like many others, believed that the former president had been robbed of a rightfully-earned victory in the presidential election.  Thus, when authorities decided that the former president had lost the election, he thought that this amounted to a "coup."

This is "backwards," of course, but Mr. Blythe was just one of many who were fooled by someone who could not accept losing.

It is important for this Court to understand, however, that as of this writing, Mr. Blythe no longer subscribes to this view, and instead feels duped by the former president.

While he realizes that he made the choice to go to the Capitol and engage in the conduct he did, he never would have been there had it not been for the urging of the former president and the influence of the crowd that had been fomented into a frenzy.

After all of the dust settles, Mr. Blythe will be, as he is now, a twice-convicted felon who will spend time in prison for engaging in conduct that goes against everything he believes in.

He has learned a very hard lesson as a result of his arrest and incarceration in this case, and the chances of his re-offending are nil.

Mr. Blythe realizes, of course, that this sentencing factor also requires that the Court consider the need to deter "others" from the type of conduct he engaged in.  And that, often (at least in counsel's view) results in sentences that are harsher than if the defendant was merely being sentenced for his own actions, without the need to scare (i.e., deter through fear) other would-be criminals.

While this factor is in the statute, counsel has always considered it an unfortunate inclusion.  While the concept of needing to deter others is understandable, it often results in a sentence that, rather than punish a defendant for his or her actions, seeks to "make an example" out of him by factoring in the *possible future* actions of other, completely unrelated (legally), people.

Briefly, counsel has seen time and time again over the course of 39 years, in situations where at the time of sentencing a courtroom is full of other accused persons

and/or their families, a judge decides that she cannot send a message to the broader community that a person can "get away" with certain behavior by receiving a light sentence, and therefore imposes a harsh(er) sentence than she might otherwise have.

If that same defendant had been sentenced in an empty courtroom, or in a situation where there would be no press coverage, he or she would have received a sentence that the court believed was appropriate, rather than one that took into account the need to "deter others."

Counsel has on quite a few occasions in the Superior Court, where many defendants await their hearings at the same time (unlike in federal court) asked the courtroom clerk to call his client's case last so that the above scenario was not created. While it has resulted in counsel having to wait many hours over the course of the years counsel has been practicing, that has been a small price for counsel to pay to save defendants months or years in prison and ensure a fair sentence is imposed.

In any event, in the case of Mr. Blythe, defendant submits that anyone who knew all the facts of his case, including his spotless background, his employment, and the embarrassing consequences of his actions would view the proposed sentence of 12 months and a day in prison, followed by a period of home confinement, as a fair one. Such a person certainly would not want to go through everything Mr. Blythe has gone through if that person decided to do what he did here – pushing against a bike rack for five seconds and remaining on the Capitol grounds in a passive stance for several hours. For these reasons, defendant submits that the proposed sentence would accomplish the foregoing goals.

***The Need to Protect the Public from Further Crimes***.

As noted above, there is absolutely no need to protect the public from any further crimes by Mr. Blythe.  He has learned a very hard lesson at a very young age (again, although he was 25 at the time of these offenses, he was not very advanced emotionally) and is never going to re-offend.

***The Court's Duty to Provide the Defendant with any Necessary Educational or Vocational Training, Medical Care, or Other Correctional Treatment***.

Mr. Blythe is not in need of any such services.

***The Need to Avoid Unwarranted Disparities***

In his efforts to find truly comparable cases, defense counsel has literally reviewed every single conviction, whether by trial or by plea, of defendants found guilty of a so-called "111" charge (aggravated assault).  Counsel must say that it has not been an easy task to find an "assault" that mirrors or parallels the actions of Mr. Blythe on January 6, 2021.  The vast majority of assaults that resulted in convictions were "true" assaults where defendants punched, kicked, hit, choked, sprayed, or otherwise actually tried to physically harm a police officer.

The following examples, involving conduct that is still much more severe than what this Court must punish in Mr. Blythe's case, at least give the Court some idea of the kinds of sentences that are being imposed in true assault cases.

<ins>United States v. Mark Leffingwell</ins>

Mark Leffingwell (21-CR-5-ABJ) also pled guilty to assaulting a police officer (a "111" charge) in connection with January 6.  But in Mr. Leffingwell's case, he *actually*

assaulted a police officer – in fact, two police officers.  As the government noted in its sentencing memorandum in that case, not only did Leffingwell actually strike two police officers *in the head*, no less, he also encouraged officers to join him and other rioters in their attempts to take the Capitol.

What makes Leffingwell's case even more galling is the fact that he was a military veteran, a disabled military veteran at that.  Yet he chose to try to overthrow the government on January 6, 2021, the very government he had sworn to protect from all enemies, foreign and domestic.

For this conduct, Mr. Leffingwell was sentenced to **six months** in prison although he struck two police officers and tried to convince the police to turn against their own government.

<u>United States v. Barton Shively, 21-CR-151(JMC)</u>

Barton Shively pled guilty to two counts of assault under 18 U.S.C. §111(a)(1).

On January 6, 2021, Mr. Shively walked over barricades that had been knocked down by others, and grabbed a police officer by the officer's jacket, yelling at that officer.  He then struck a second officer in the officer's hand, head, and shoulder area. He then attacked *still more* officers, hitting one in the head with the officer's own baton, and kicking another officer with his (Shively's) boot.

After the attack, Shively gave a public news interview praising what the rioters had done that day.

For his actions, as this Court knows, Mr. Shively was sentenced to *18 months* in prison on each count, to run concurrently, followed by three years of supervised release.

United States v. Matthew Ryan Miller, 21-CR-75(RDM)

Matthew Ryan Miller entered guilty pleas to one count of Obstruction of an Official Proceeding (a so-called "1512" charge) and one count of Assault (a "111") charge.

In his Statement of Offense ("SOF"), Mr. Miller admitted that he had posted a picture of himself on Instagram at the rally.

Mr. Miller then used a section of the temporary barriers used by the U.S. Capitol Police as a ladder to scale the walls of the west side of the Capitol plaza. He also assisted others who were scaling the wall and other architectural objects.  *SOF*, at 4.

When he was at the lower west terrace, he "waved his hand, and said multiple times, 'come on' as the mob chanted 'heave ho' and rocked back and forth in a push towards the tunnel entrance…."  Multiple times, Mr. Miller "put up his fingers and yelled 'one, two, three, push!'"  *Id*.

The Statement of Offense also states that Mr. Miller, "[f]rom this position … threw a few unidentifiable objects towards the … tunnel where law enforcement officers were attempting to secure the U.S. Capitol."  *Id*.

Finally, when Mr. Miller was closest to the tunnel, he used a fire extinguisher to spray into the tunnel where many law enforcement officers were pushing back against rioters.  He therefore affected much more than one officer with the chemical contained in the fire extinguisher, and his actions actually caused direct contact with these officers – contact that was painful and lasting.

For his actions, including incitement to violence, he received a sentence of **33 months** in prison on each count, to run concurrently, and 24 months of supervised release.

Mr. Blythe's actions come nowhere close to what Mr. Miller did that day, and because of that, his sentence should not come close to Miller's sentence.

United States v. Logan Barnhart, 21-CR-35(RC)

On January 6, 2021, Logan Barnhart and others attacked a line of police officers and knocked them to the ground.  During this attack, Barnhart grabbed an officer's neck and torso (apparently by grabbing his clothing) and dragged him over the body of another police officer and down a set of stairs where the officer was further attacked with weapons, including a flagpole and a baton.  The officer sustained physical injuries.

Shortly thereafter, Barnhart returned to the police line and joined others in charging against that line.  He then wielded a flagpole and used it to strike several more officers.

For all of that, Mr. Barnhart received a prison sentence of **36 months** followed by 36 months of supervised release (and other minor sanctions).

Again, Mr. Blythe's conduct bears no resemblance to the actions of Mr. Barnhart.

The government cites other cases where defendants received very lengthy sentences, but none of those cases is truly comparable to the instant case, and should not be used as comparators when deciding on an appropriate sentence.

Summary of Comparable Cases

Mr. Blythe could go on and on discussing other "111" cases that demonstrate the range of sentences judges have typically imposed in these circumstances. It is notable, however, that these cases all involved actual physical assault on the body of a police officer, rather than the merely pushing a bike rack, or standing in a certain area (outside the Capitol) for a period of time.

Defendants who actually attempted to harm officers by punching, kicking, pulling, grabbing, spraying, or otherwise physically contacting officers in a brutal manner should receive harsher sentences. But that is not what Mr. Blythe did here at all.

### *Conclusion*

The government, in its memorandum, notes that Mr. Blythe has not expressed any remorse for his actions. That is true with respect to any public apology, but only because he has not yet had the opportunity to speak at sentencing.

He has expressed to undersigned counsel, and he will express to this Court at sentencing, how he greatly regrets having been a part of the events of January 6. He understands that it has brought shame on the United States, and on himself. Were he able to turn back time and behave differently, he would. But there is no question that he is very remorseful for his actions. He just hasn't stood before this Court for sentencing yet, so his words have not yet been expressed in public.

Defendant asks this Court, after a careful consideration of all of the arguments presented herein, to impose a sentence of 12 months and a day in prison, followed by a one-year period of home confinement, followed then by a period of supervised release. This, he submits, would be just and fair, and sufficient, but not greater than necessary, to

adequately punish him for his conduct, and accomplish all of the goals set out in the

sentencing statute.

Respectfully submitted,

/s/

Stephen F. Brennwald, Esq.
Bar No. 398319
Brennwald & Robertson, LLP
922 Pennsylvania Avenue, S.E.
Washington, D.C.  20003
(301) 928-7727
(202) 544-7626 (facsimile)
E-mail:  sfbrennwald@cs.com

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was sent by ECF, this 12th day of September, 2024, to all counsel of record.

/s/

Stephen F. Brennwald